## Case No. 3,624.

DAVIS et al. v. ARMSTRONG.

[3 N. B. R. 33 (Quarto, 7); [1] 2 Am. Law T. 138.]

District Court, N. D. Mississippi.

ACTS OF BANKRUPTCY — FRAUDULENT SUSPENSION —WHO ARE TRADERS.

A trader gave promissory notes in part payment of purchases of goods, and before they fell due, sold out the balance of his stock in gross, without invoice, at ten o'clock at night, to a purchaser for ten hundred and thirty-two dollars cash, and went out of business, after paying one of the notes before maturity. He failed to pay the other notes at maturity, and they remained unpaid for more than fourteen days. *Held*, it was no defense that the debtor had ceased to be a trader at the period of suspension. The sale for cash was not a sale made in the ordinary course of business. The suspension of payment of his paper was fraudulent, and he must be adjudicated a bankrupt.

[Cited in Re Hercules Mut. Life Assur. Soc., Case No. 6,402; Re Carter, Id. 2,470; Re Weaver, Id. 17,307.]

---

[1] [Reprinted from 3 N. B. R. 33 (Quarto, 7), by permission.]

[Petition in bankruptcy by Davis & Green against F. M. Armstrong.]

HILL, District Judge. This case in involuntary bankruptcy is submitted to the court upon petition, answer, and proof. The act of bankruptcy charged is that said defendant, being a merchant, did, on or about the 25th of February, 1868, fraudulently suspend the payment of his commercial paper, and did not resume payment thereof within a period of fourteen days. The answer denies the bankruptcy charged. The issue thus made makes it incumbent upon the petitioners to establish, by proof, the bankruptcy charged. The most important proof is that produced by the defendant, and is found in his deposition, and is substantially as follows: That in the latter part of October, 1867, he purchased, in the city of Louisville, Ky., from various wholesale dealers, a stock of goods for retail, at Red Land, in Pontotoc county, Miss.; that about four thousand dollars of said stock was purchased on a credit, and a portion, about one thousand dollars, for cash; that among the purchases was one from the petitioners for the sum of nine hundred and twenty-six dollars, for which he executed his note, due at four months, and payable on the 24th February, 1868; that he brought the goods to Red Land and offered them for sale at retail until the 26th December, 1868, when he sold out the entire stock remaining on hand, to one Bounds, for the sum of ten hundred and thirty-two dollars, which was paid him in cash; that it was a lumping trade, made without taking any invoice of the stock; that the trade took place between nine and ten o'clock at night; that of the sum so received he paid off and took up one of the notes given for the stock, amounting to five hundred and fifty-eight dollars; that the payment was made before the maturity of the note; that he received a discount of ten per cent.; that he immediately left Red Land, and went to look after his father's estate, some thirty miles distant, his father having recently died; that he then ceased to be a merchant, and has so continued to the present time; that whilst doing business, as a merchant at Red Land as stated, he kept no books, showing the condition of his business, only kept memoranda; does not know the amount due him, and either does not know or declines to state from whom; states that had it not been for the fall in cotton his estate, real and personal, was at the time of sale to Bounds, sufficient to have paid his debts. He does not state what amount of cash he received for the sale of goods made at retail or the disposition he has made of it, or the disposition made of the balance received from Bounds, but admits that the note due to petitioners remains unpaid; and that on its maturity, he owed on said purchases some two thousand two hundred dollars; does not state whether any part of the same has since been paid.

The main ground of defense relied upon is, that at the time of suspension of payment stated, defendant was not a merchant or trader. This renders it necessary to give a construction to this clause in the bankrupt act [of 1867 (14 Stat. 531)], and in order to arrive at a correct conclusion, we must ascertain the benefits intended to be secured, and evils remedied. In all commercial countries, such as ours, it is deemed a matter of the first importance, that obligations and contracts entered into by those engaged in such pursuits, and in the transaction of commercial business, shall be promptly paid, and for the reason that the failure of one, often occasions the failure of others. These obligations, in the shape of notes, bills, checks, etc., form a part of the circulating medium between those, engaged in such pursuits. The reason, therefore, that a distinction is made, in the bankrupt act, between merchants, bankers, and traders, in meeting their commercial obligations, and the rest of the community, is to secure promptness and good faith with this useful class of the community; and to secure this desirable object, a fraudulent failure to meet these obligations, is declared to be an act of bankruptcy; such being the object and purpose of the law-makers, the proper construction of the act should be read as follows: That a merchant, banker, or trader, who, in the course of his business as such, shall execute notes, bills, or other instruments which circulate as commercial paper, and who fails to pay the same within fourteen days after maturity, or the same shall have become due and payable, without a sufficient excuse for such failure, shall be deemed to have fraudulently suspended payment, and shall be declared a bankrupt. If this be the true construction of the act, it follows that if the maker of the paper is a merchant, banker, or trader, at the time of its execution, he becomes liable to meet it in the time specified, unless he can show a sufficient excuse for failing so to do, or he becomes liable to this provision of the law, no matter what his occupation may then be. This brings us to another important inquiry, that is, has the defendant shown a sufficient excuse for the non-payment of the petitioner's demand, the note having become payable on the 24th February, 1868, and their proceedings not having been commenced until the 26th of the following June, a period of over four months; or, in other words, was it, within the meaning of the act, a fraudulent suspension? The note was executed after the passage of the act, and the defendant must be held to have assumed all the obligations and liabilities imposed by the act, one of which was that he should keep proper books, showing the true condition of his business, the stock invested, the cash received, cash on hand, debts due him, cash paid out, and debts outstanding against him in his business, a failure to do which, after the passage of the act, is, by the 29th section, declared to be a

cause for refusing the bankrupt a discharge, or, if granted, for its revocation. The defendant has failed to meet this obligation. By the 35th section of the act it is provided that a conveyance, sale, assignment, or transfer, not made in the usual and ordinary course of business of the debtor, shall be deemed prima facie evidence of fraud. The sale of a stock of goods of five thousand dollars or more, that had only been on sale at retail for about two months, when cotton was down at nine and ten cents per pound, and when money was scarce in the country, made at night, in a lump, without examination or invoice, at the sum of one thousand and thirty-two dollars, cannot be held to be in the usual and ordinary course of the business of a merchant. Other sections of the act might be referred to to show that the utmost good faith and fair dealing is required of those so engaging in mercantile pursuits; a failure to observe which, is treated as evidence of fraud. When a merchant engages in business and purchases his stock, or any part of it, on credit, there is an implied promise that the proceeds of the sale shall be applied to their payment. The merchant commits a fraud upon his creditor if he appropriates the proceeds to any other purpose until the obligation is discharged; indeed, his whole capital stock is virtually pledged for the payment of such commercial liabilities as he may incur in such business; he is further pledged to give to his business his best skill and attention, and a failure to comply with these requisitions may be held a fraud on the rights of those who have given him credit in his business, and whose demands remain unsatisfied. The reason given by the defendant, that he did not pay the note before the commencement of these proceedings, is unsatisfactory. Had the goods been received and sold when cotton was at a high price, and when there was every expectation of easy collections, and then fallen, the reason would have been more plausible; but they were purchased when cotton was at the low price, and should not have been sold on credit only to those able to pay at the low price of cotton. The low price of cotton would have been a good reason why sales were not made, but if not made, it should have remained on hand, and not sold for the small sum of one thousand dollars or thereabout; upon the other hand, if the goods were sold it was the duty of the defendant, either by himself, or some suitable person employed for the purpose, to collect these debts, or at least to have required the debtors to execute their notes for the amount due.

Although the defendant was permitted to give his own deposition, upon re-hearing of the cause, he has wholly failed to show what amount of cash he received for goods, the amount due and unpaid, or the disposition he has made of the same. These circumstances, together with his whole transaction, connected with his mercantile business, whether so intended or not, must be held, within the meaning of the bankrupt act, to have resulted in a fraudulent suspension of the note of petitioner, which is upon its face mercantile paper, and was in fact so executed; and rebuts the excuse given for its non-payment, and must be declared an act of bankruptcy. The enforcement of this side of the bankrupt law is decidedly unpleasant, but when cases arise, they must be met, and disposed of according to law and testimony as the court understands them. Fortunately, so far, out of nearly five hundred cases, not more than twenty have been on the involuntary side of the docket, and not more than half that number have been contested; and of the remaining number but few have come to the final hearing, so that so far, this portion of the law has received but little consideration from either the court or the bar. It may, however, be well that its principles be understood by the community, especially those engaged in trade, that any necessity for its enforcement may be avoided in the future, as in the past.